IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-31098

_____

In The Matter of: HORACE J. LEWIS, JR.,

                                                    Debtor.

LOUISIANA DEPARTMENT OF REVENUE AND TAXATION,

                                                    Appellant,

versus

HORACE J. LEWIS, JR.

                                                    Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

January 7, 2000

Before REYNALDO G. GARZA, JOLLY, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this bankruptcy appeal we must answer the question whether taxes owed by Chapter 7 Debtor-Appellee Horace Lewis ("Lewis") to the Appellant Louisiana Department of Revenue & Taxation ("LDR") are excepted from discharge in bankruptcy. We find that Lewis's tax obligations were not dischargeable and therefore reverse.

## I.

### FACTS AND PROCEEDINGS

The Internal Revenue Service ("IRS") audited Lewis's federal income tax returns for tax years 1982 through 1991, and determined

that he owed additional federal tax for each of these years. A Louisiana taxpayer whose federal income tax returns are so adjusted is required by statute to furnish a statement to the LDR disclosing the nature and amount of the adjustments.[1] Consistent with this requirement, Lewis filed amended Louisiana income tax returns on August 22, 1995 for tax years 1982-91. Lewis did not, however, remit the additional tax liability reflected on his amended Louisiana returns.

On October 27, 1995, the LDR sent Lewis ten notices of proposed assessment, frequently referred to as "15-day letters," one for each tax year at issue. These notices, printed on a standard LDR form, state the nature and the amount of the tax liability, including related interest and penalties, and inform the taxpayer that he has 15 days from the date of the notice either to (1) protest the proposed assessment or (2) pay it. The bottom one-third of each notice is a payment coupon.

As Lewis neither paid not protested timely, the LDR issued formal notices of assessment for each of the ten tax years at issue. The parties have stipulated that the LDR sent these formal notices of assessment to Lewis by certified mail on December 8, 1995.

Lewis filed for Chapter 7 bankruptcy protection on July 11, 1996. The LDR submitted a proof of claim, asserting that Lewis owed taxes, interest, and penalties totaling $19,375. The IRS also filed a proof of claim for unpaid taxes and interest. Lewis

---

[1]See LA. REV. STAT. § 47:103 C.

responded by filing the instant adversary proceeding against both the IRS and the LDR, seeking a determination that his state and federal tax debts were dischargeable in bankruptcy. Prior to trial, the IRS conceded that Lewis's federal tax debt was dischargeable, leaving as the only issue before the bankruptcy court whether Lewis's debt to the LDR is dischargeable. After trial, the bankruptcy court ruled in Lewis's favor, concluding that the debts were dischargeable. The LDR appealed, and the district court affirmed the bankruptcy court's ruling. The LDR timely filed this appeal.

## II.

### ANALYSIS

A. Jurisdiction & Standard of Review

We have jurisdiction under 28 U.S.C. § 158(d) to hear bankruptcy appeals from final judgments of the district courts. The determinative issue before us is the meaning of "assessed" as that term is used in 11 U.S.C. § 507(a)(8)(A)(ii) of the Bankruptcy Code. This is a question of law and therefore subject to de novo review.[2]

B. Dischargeability of Lewis's Tax Debts

Generally, the bankruptcy court discharges Chapter 7 debtors from all of their pre-petition debts, subject to a number of exceptions.[3] One of the exceptions, found in 11 U.S.C. §

---

[2]See Matter of Kennard, 970 F.2d 1455, 1457-58 (5th Cir. 1992) (questions of law in bankruptcy appeals are reviewed de novo).

[3]See 11 U.S.C. § 727(a).

3

523(a)(1)(A), denies discharge for, inter alia, taxes granted priority in distribution under § 507(a)(8)(A)(ii).[4]  That subsection provides in relevant part that allowed unsecured claims of governmental units are given priority — and are thus rendered nondischargeable by § 523(a)(1)(A) — to the extent that such claims are (1) for a tax on or measured by income or gross receipts, and (2) assessed during the 240-day period immediately preceding the date the bankruptcy petition is filed.  Whether Lewis's debt to the LDR is dischargeable turns on whether this exception to discharge applies.

Lewis concedes that the taxes at issue are taxes on income; therefore they satisfy the first requirement of § 523(a)(1)(A). What remains for us to determine is whether the subject taxes were assessed more than 240 days before July 11, 1996.  The bankruptcy court and the district court each engaged in a detailed analysis of the Louisiana Revised Statutes, and each concluded, under alternative rationales, that the LDR assessed Lewis more than 240 days before July 11, 1996, making his tax obligation dischargeable in bankruptcy.

The arguments made by the parties on appeal (like their arguments to the bankruptcy and district courts) are directed solely to ascertaining the moment when the Louisiana Revised Statutes labels the taxes as "assessed."  As we shall show,

---

[4]Prior to trial, the LDR withdrew its argument that the amended returns Lewis filed on August 22, 1995 are returns filed within two years prior to the filing of Lewis's bankruptcy petition.  This rendered inapplicable the exception to discharge codified at 11 U.S.C. § 523(a)(1)(B).

however, the question before us is <u>not</u> when the taxes were deemed "assessed" by Louisiana law, but rather when the substantive legal rights afforded by Louisiana law created circumstances that federal law, specifically § 507(a)(8)(A)(ii), recognizes as an assessment. Thus our task is twofold:  We must first identify when taxes are considered assessed for purposes of § 507(a)(8)(A)(ii); then we must analyze the substantive rights (not merely the labels) created by Louisiana law to determine when the taxes were assessed for purposes of § 507(a)(8)(A)(ii).

1.    The Meaning of "Assessed" Under 11 U.S.C. § 507(a)(8)

Determining when taxes were "assessed" within the meaning of the Bankruptcy Code is a question of federal law.[5]  The Code does not supply a definition.  Generally, when that is the case, we turn to the legislative history in an attempt to glean congressional intent.  Regrettably, our effort in that regard bore no fruit. Dictionaries are similarly unhelpful, not because they do not supply a definition, but because they assign so many different meanings to this term.[6]

---

[5]<u>See</u> <u>In re Garfinckels, Inc.</u>, 203 B.R. 814, 817 (D.D.C. Bankr. 1996) (holding that the definition of "assessed," "is a Federal question, not a state law question.  While Maryland law establishes certain events with respect to the imposition of a tax, Federal law determines whether those events constitute an assessment."); <u>King v. Franchise Tax Board (In re King)</u>, 961 F.2d 1423, 1427 (9th Cir. 1992); 4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 507.10[2][b], p. 507–63 n.19 (15th rev. ed.) [hereinafter COLLIER] ("the determination of when an assessment occurs remains a question of federal law and not state law.").

[6]Webster's Third has four definitions, three of which relate to taxation.  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 131 (1986 ed). Black's provides that "assessed" is "equivalent to 'imposed.'  To value or appraise."  BLACKS LAW DICTIONARY 116 (6th ed).

In *In re Hartman*, the court persuasively explained why Congress chose to use "assessed":

> Recognizing the difficulty of defining "assessment" so as to encompass all possible tax procedures of federal, state, and local governmental units, Congress employed a common term of tax lexicon and left its peculiar meaning to depend upon the particular tax procedures [at issue in a given case].[7]

This supposition regarding congressional intent makes sense. It also has the virtue of enabling courts to fashion a more or less uniform substantive rule regarding when taxes are assessed, a rule that we perceive as preferable to one that relies on the inconsistent labels used by the various federal, state, and local tax statutes.

When federal income tax is at issue, the meaning of "assessed" under § 507(a)(8)(A)(ii) is well settled: The vast majority of courts have adopted the Internal Revenue Code ("I.R.C.") definition.[8] Under the I.R.C., prior to making an assessment, the IRS must send the taxpayer a notice of deficiency (the so-called "90-day letter"),[9] after which the taxpayer has 90 days to seek a redetermination of that deficiency in the Tax Court.[10] If 90 days elapse without the taxpayer's filing for redetermination in the Tax

---

[7] 110 B.R. 951, 956 (D. Kansas 1990); see also Hardie v. United States (In re Hardie), 204 B.R. 944, 946 n.8 (S.D. Tex. 1996); Darrell Dunham & Alex Shimkus, Tax Claims in Bankruptcy, 67 AM. BANKR. L.J. 343, 349-51 (Summer 1993).

[8] See COLLIER, supra n. 5, ¶ 507.10[2][b], p. 507-62 et seq. ("for federal income tax purposes, courts have almost unanimously adopted the Internal Revenue Code definition." (citing cases)).

[9] See 26 U.S.C. § 6212(a).

[10] See id. at § 6213(a).

Court, the IRS is free to <u>assess</u> the taxes.[11]   If, however, the taxpayer does timely file a petition for redetermination in the Tax Court, then when the decision of the Tax Court becomes final and nonappealable, the IRS may <u>assess</u> the taxes.[12] Either way, though, the precise time at which the IRS makes a notation in the records of the Secretary is the time when the assessment is deemed to occur.[13]

This notation, or "assessment," is an affirmative act by the IRS and one that occurs at a discrete, identifiable time.  It marks the precise time when federal taxes are "assessed" for federal tax law and also for § 507(a)(8)(A)(ii).[14]  The practical significance of this act is that it creates a valid lien on the taxpayer's property in favor of the IRS.[15]  Thus, "in the federal scheme assessment involves the taking of an interest in the taxpayer's property after affording the taxpayer notice of an alleged deficiency and an opportunity to challenge the deficiency."[16]

In <u>King v. Franchise Tax Board (In re King)</u> the Ninth Circuit held that, under California law, state income taxes were "assessed" for purposes of § 507(a)(8)(A)(ii) when the state taxing

---

[11]<u>See</u> <u>id.</u> at § 6202; 26 C.F.R. § 301.6213-1(a).

[12]<u>See</u> <u>id.</u>

[13]<u>See</u> 26 C.F.R. § 301.6203-1.

[14]<u>See</u> <u>supra</u> n.8.

[15]<u>See</u> 26 U.S.C. §§ 6321-22.

[16]<u>See</u> <u>King v. Franchise Tax Board of California (In re King)</u>, 961 F.2d 1423, 1425 (9th Cir. 1992).

authority's determination of tax liability became "final."[17] The court reasoned that "it is common sense that a tax assessment, as a formal act with significant consequences, cannot occur before it is final."[18] The King court proceeded to examine the California tax collection procedures and identified the precise time when the relationship between the California Franchise Tax Board and the taxpayer becomes the functional equivalent of the relationship that is created between the IRS and a taxpayer when a federal tax is assessed.[19]

We agree that finality should be the touchstone of a § 507(a)(8)(A)(ii) assessment. We therefore turn to the Louisiana tax collection procedures applicable to this case to determine when finality was achieved.

## 2. Louisiana Assessment and Collection Procedure

Sections 1561 through 1574 of Title 47 of the Louisiana Revised Statutes establish the framework within which the LDR assesses and collects taxes. The first of these, § 1561, functions as a gatekeeper. It provides that the LDR may proceed to collect taxes by any one of three alternative methods: (1) assessment and distraint; (2) summary proceeding in court; or (3) ordinary

---

[17]Id. at 1427.

[18]Id.

[19]See Id. See also Franchise Tax Board v. Bracey (In re Bracey), 77 F.3d 294, 295 (9th Cir. 1996) ("A tax deficiency is 'assessed' for purposes of rendering the assessment nondischargeable not when the notice of assessment is filed, but when the assessment becomes 'final.'"); In re Williams, 188 B.R. 331, 334-35 (E.D.N.Y. [date]) (applying the same analysis to New York law).

**8**

proceeding in court.[20]  In every case, the LDR has unfettered discretion to choose which of the three methods it will pursue, and the remedies and delays afforded to the taxpayer are only those that are not inconsistent with the method selected and initiated by the LDR.[21]

In this case, the LDR chose to proceed against Lewis under the first alternative, assessment and distraint.  Under this alternative, the proper procedure depends on whether the taxpayer has (1) either failed to file a return or filed a return that the LDR finds inaccurate (in such cases the procedures codified at §§ 1562-65 apply), or (2) filed a return but failed to remit the taxes due and owing (in such cases the procedures codified at § 1568 apply).  Not until the LDR audits the return, however, can it determine whether it agrees with the liability reported by the taxpayer; so it is only after an audit is completed that the LDR can discern whether it must proceed under §§ 1562-65 or, alternatively, under § 1568.

When the LDR finds a return to be inaccurate, § 1562 directs the LDR to determine the full amount due, including interest and penalties, and to notify the taxpayer that it plans "to assess the amount so determined against him after [15 days] from the date of

---

[20]LA. REV. STAT. § 47:1561; See also Collector of Revenue v. Olvey, 117 So. 2d 563 (La. 1959) (explaining the operation of Revised Statutes §§ 1561 et seq. and sustaining the constitutionality of these provisions).

[21]LA. REV. STAT. § 47:1561.

the notice."[22]  Then, under § 1563, the taxpayer has 15 days to file a protest letter with the LDR challenging the proposed assessment.[23] If the taxpayer does so, the LDR "<u>shall consider</u> the protest, and in [its] discretion may grant a hearing thereon, before making a <u>final determination</u> of tax, penalty and interest due."[24]  Under § 1564, after 15 days pass, "or at the expiration of such time as may be necessary for the [LDR] to consider any protest filed," the LDR  "shall <u>proceed to assess</u> the tax, penalty, and interest that [it] determines to be due . . . ."[25]

After the LDR "proceeds to assess" the taxpayer pursuant to § 1565, the LDR must send the taxpayer a formal notice of assessment informing him that he has been assessed and that he has 60 days either to (1) pay the assessment, or (2) file an appeal with the Board of Tax Appeals ("BTA").[26]  If the taxpayer neither pays the assessment nor files a BTA appeal within 60 days, the assessment becomes final; only then may the LDR <u>distrain and sell</u> the taxpayer's property under the procedures set forth at §§ 1569-73.[27] When an assessment becomes final under this distraint and sale

---

[22]<u>Id.</u> § 47:1562.  This section was amended by Acts 1997, No. 794, § 1, eff. July 10, 1997.  The amendment was not effective for any of the tax years at issue and all citations in this opinion are to the statute as it existed prior to the amendment.

[23]<u>See id.</u> § 47:1563.

[24]<u>Id.</u> (emphasis added).

[25]<u>Id.</u> § 47:1564 (emphasis added).

[26]<u>See id.</u> § 47:1565 A.

[27]<u>See id.</u> § 47:1565 B.

procedure, i.e., neither pays nor appeals to the BTA, it is the functional equivalent of a final nonappealable judgment; however, when the taxpayer appeals to the BTA for a redetermination of the LDR's assessment, then it is the finding of the BTA (or of a state district or appellate court reviewing the decision of the BTA, if additional appeals are taken) that constitutes a final judgment.

In contrast, § 1568 controls when a taxpayer who has filed a return that the LDR audit finds to be accurate fails to pay the tax obligation reported on that return. Once the LDR verifies the accuracy of the return, the liability on the return, "together with any penalty and interest due or accruing thereon, whether computed or not, shall be considered assessed."[28] This is apparently so because (1) the taxpayer has, by filing the return, admitted that the liability reported on that return is, to the best of his knowledge, accurate, and (2) the LDR has agreed with the taxpayer's "self-assessment." It is therefore unnecessary to afford the taxpayer the right to file a protest with the LDR or to appeal to the BTA. Consequently, the next step, as dictated by § 1568, is that the LDR shall "immediately send a notice by mail to such person . . . demanding payment of such amount within ten calendar days from the date of the notice."[29]

Functionally, this payment demand under § 1568 is the analogue of what § 1565 terms the "notice of assessment" for taxpayers who have filed an inaccurate return or no return at all. The

---

[28]Id. § 47:1568.

[29]Id. § 47:1568 (emphasis added).

**11**

substantive legal rights afforded to the LDR —— rights identical to those given the holder of a final nonappealable judgment that, for purposes of § 507(a)(8)(A)(ii) is the "assessment" —— arise automatically at the expiration of ten days (rather than 60 days as is the case for taxpayers who receive a formal notice of assessment and fail to exercise their right to appeal to the BTA).

In the instant case, the LDR's assessment and collection of Lewis's tax liability for the first eight tax years (1982–89) should have proceeded under § 1568 because the LDR's audit of those years showed his returns to be accurate. Based on the plain wording of § 1568 the LDR's proper course of action was to demand payment under the second procedure outlined above. That demand would have ripened into a final assessment automatically if not paid within ten days.

The LDR did not, however, follow the statutory protocol. Instead of issuing the § 1568 10-day demand for payment, the LDR followed the procedure detailed in §§ 1562-65, sending a 15-day letter and then issuing a notice of assessment (issuance of the notice of assessment commenced the 60-day period within which Lewis could have appealed to the BTA). The effect was that, for the first eight years, the LDR gave Lewis greater rights than it was required to by the applicable statutes. Had the LDR sent a § 1568 10-day payment demand (as it should have) instead of a § 1562-65 15-day demand letter, the demand would have become final, and thus a § 507(a)(8)(A)(ii) "assessment," on November 6, 1995, 248 days before Lewis filed his bankruptcy petition. But, because the LDR

**12**

followed the procedure detailed in §§ 1562-65, it was not until February 6, 1996, 60 days after the notice of assessment was issued and only 156 days before Lewis filed for bankruptcy, that the LDR's assessment become subject to collection by distraint and sale and therefore "assessed" for purposes of § 507(a)(8)(A)(ii).

In contrast to the first eight years, the LDR's audit for the last two revealed that Lewis's returns were inaccurate.[30] Accordingly, for those two years, assessment and collection should have been and was in fact conducted pursuant to §§ 1562-65.

If, for the first eight years, we were to consider the procedure that should have been followed, i.e., the payment demand followed by a ten day waiting period as set forth in § 1568, we would be led to conclude that for purposes of § 507(a)(8)(A)(ii) the taxes were "assessed" outside of the 240-day period and are therefore dischargeable in bankruptcy. But this is not the procedure that the LDR actually followed. The question thus becomes whether the LDR can be bound by a course of action that it should have but did not follow.

As noted, by following the §§ 1562-65 procedures, the LDR gave Lewis greater rights than he was entitled to; therefore, there could be no sustainable claim that Lewis received less process than he was due. Further, there is no evidence in the record to suggest

---

[30]Both the bankruptcy court and the district court stated in their opinion that the returns for the first nine years were accurate and the LDR's audit revealed a discrepancy only for the last year (1991). Our review of the record, however, indicates that the LDR made adjustments to Lewis's tax returns for both 1990 and 1991.

that the LDR intentionally employed this alternative procedure to secure an advantage on the off chance that Lewis might file for bankruptcy protection in the near future. To the contrary, the only indication is that the LDR followed the wrong procedure through pure inadvertence. Finally, the action taken by the LDR was water under the bridge by the time Lewis <u>voluntarily</u> filed for bankruptcy protection. As Lewis's bankruptcy was voluntary, it was Lewis who controlled its timing. The LDR did not force — and acting alone probably could not have forced — Lewis into bankruptcy involuntarily and thereby manipulate the end date of the 240-day period. We speculate that Lewis filed when he did for no particular reason or for some reason unrelated to his state income tax debt — or possibly that he miscalculated just how long he needed to delay filing so as to have the Louisiana tax debt become dischargeable.

We conclude that the procedure actually followed by the LDR is determinative for all ten tax years at issue. Under that procedure, when Lewis neither paid nor appealed to the BTA within 60 days after the § 1565 notice of deficiency was issued, the determination of the LDR automatically became final. At that time the liability evidenced by the notice of assessment was for the first time collectable by distraint and sale and therefore "assessed" as that term is used in § 507(a)(8)(A)(ii). That occurred on February 6, 1996 — 156 days before Lewis filed his bankruptcy petition, well within the 240 day nondischargeability window. Accordingly, the LDR's claim is not dischargeable in

**14**

bankruptcy.

### III.

### CONCLUSION

On the day that Lewis filed for Chapter 7 bankruptcy protection, the LDR held a claim for unpaid income taxes. Those taxes had been assessed less than 240 days earlier and are thus excepted from discharge in bankruptcy. We therefore hold that Lewis's debt to the LDR is nondischargeable under §§ 523(a)(1)(A) and 507(a)(1)(A)(ii). The decision of the bankruptcy court is reversed and judgment is rendered in favor of the LDR.

REVERSED and RENDERED.